CORPORACION SUBLISTATICA, S. A., Plaintiff,

v.

The UNITED STATES, Defendant.

Court No. 77–11–04749.

United States Court of International Trade.

Jan. 14, 1981.

---

6. The 871 Belt Pouch.

7. The 565 Fanny Bag.

8. The 869 Stuff Bag.

9. See *Newman Importing Co. Inc. v. United States*, 76 Cust.Ct. 143, C.D. 4648 (1976).

Siegel, Mandell & Davidson, New York City (Herbert T. Posner, New York City, at the trial and on the brief), for plaintiff.

Alice Daniel, Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, Atty. in Charge, International Trade Field Office, Commercial Litigation Branch, New York City (Sidney N. Weiss, New York City, at the trial and on the brief), for defendant.

BOE, Judge:

In the above-entitled action the merchandise in question, consisting of powders containing benzenoid crude colors and ethylcellulose, was imported from Switzerland and entered at the port of San Juan, Puerto Rico between December 1973 and December 1975.

Upon liquidation the merchandise was classified under item 406.50, TSUS, providing:

SCHEDULE 4. – CHEMICALS AND
RELATED PRODUCTS
Part 1. – Benzenoid Chemicals and Products

| | | |
|---|---|---|
| 406.50 | Colors, dyes, and stains (except toners), whether soluble or not in water, obtained, derived, or manufactured in whole or in part from any product provided for in subpart A or B of this part . . . . . . . . . . . . . . . . . . . . . . | 20% ad val. |

The plaintiff, however, contends that said merchandise should be properly classified under item 474.26, TSUS, providing:

SCHEDULE 4. – CHEMICALS AND
RELATED PRODUCTS
Part 9. – Dyeing and Tanning Products; Pigments
and Pigment-Like Materials; Inks,
Paints, and Related Products

Inks and ink powders:

 * * * * * *

| | | |
|---|---|---|
| 474.26 | Other inks . . . . . . . . . . . . . . . . . | 2% ad val. |
| | Printing and lithographic inks . . . . . . . . . . . . . . . . . | |
| | Other . . . . . . . . . . . . . . . . . | |

In the alternative plaintiff contends the merchandise should be classified as ink powders under item 405.10, TSUS, providing:

SCHEDULE 4. – CHEMICALS AND
RELATED PRODUCTS
Part 1. – Benzenoid Chemicals and Products

Products obtained, derived, or manufactured in whole or in part from any product provided for in subpart A or B of this part:

\* \* \* \* \* \*

405.10 Ink powders . . . . . . . . . . . . . . . . 1.7¢ per lb.
11% ad val.

The powders in question, more specifically referred to herein as Yellow 2100, Red 2301, Violet 2404, Blue 1561 and Blue 2505 are products of Ciba-Geigy, A. G., a chemical manufacturing company located in Switzerland. In their manufacture the colorant, a benzenoid dye, is combined with salt and ethylcellulose in a heavy-duty plate kneader. The foregoing ingredients are ground together forming a homogeneous mixture. Upon the addition of a solvent consisting of diacetone alcohol, a "globby paste" is formed. After cooling, further kneading is continued for a considerable length of time. With the addition of water to the paste within the kneader, the alcohol solvent and the salt are dissolved forming a "watery slurry." In a subsequent filtering process the watery substance is separated from the powder. The latter is then thoroughly rinsed removing all remaining traces of salt and solvent. The resulting powder, when dried, consists of a benzenoid dye colorant of approximately 75% and ethylcellulose of approximately 25%, with the exception of Blue 1561 which consists of approximately 50% dye colorant and 50% ethylcellulose.

After the importation and delivery of the powder in sealed drums to the plaintiff at its printing plant in Puerto Rico, ethanol is added thereto causing the powder to liquify. This substance is thereupon used by the plaintiff in a standard gravure press to print desired patterns and designs upon customary rotogravure paper. Although gravure printing is used in connection with the printing of wrapping papers, newspapers, packaging for various products and transfer paper, it is the printing and sale of the latter product with which the plaintiff is principally engaged.

In support of the classification of the imported powders as a dye under item 406.-50, TSUS, the defendant directs our attention to the nature of the image printed by the gravure press upon the paper as well as the result occurring when the printed image upon the paper is transferred to a textile in a subsequent and unrelated process referred to as "heat transfer."

In the "heat transfer" process a portion of the dye colorant contained in the image printed on the gravure paper is caused to sublime by means of the application of high pressure and a high temperature ranging from 160° to 220° C., thereby causing in turn the image or design to be transferred or affixed to the textile material.

■ From the testimony of the witnesses presented in the trial of the instant action, this court concludes that the imported merchandise in question is not a dye.

All witnesses are in agreement, including the defendant's single witness, that a dye, without the addition of a binder cannot be used in a gravure press. The testimony of the defendant's witness, Dr. Feeman, as well as the test report of the United States Customs Laboratory, a part of the official record of the within proceedings, acknowledge that the imported powder contains two components—a benzenoid dye colorant and a polymer binder consisting of a cellulose component.[1]

From the evidence adduced at the trial herein, it is manifestly clear that ethylcellulose provides viscosity to the ink necessary

1. The report of the United States Customs Laboratory describes a sample:

The sample, a dark red powder, is composed of a benzenoid dye and a synthetic plastics material (cellulose ester type).

Schedule A information indicates it is used in the printing of paper.

This office knows of no comparable domestic product.

to permit its utilization in gravure printing. The evidence likewise is undisputedly clear that it is the ethylcellulose which in the printing process binds the dye colorant to the paper in the form of a desired image, thereby permitting the favorable sublimable characteristic of the benzenoid dye colorant contained in the printed image to be advantageously utilized in a subsequent independent heat transfer process. As succinctly described by the plaintiff's expert witness, Professor Gryte, the grinding of the benzenoid dye colorant with the polymer, ethylcellulose, causes the former to become veritably encapsulated by the latter. The powder resulting from the grinding process contains no separate and distinct components and is in fact a "homogeneous mixture," evidencing, however, the dominant characteristics of the ethylcellulose contained therein.[2]

In its testimony challenging the liquidated classification of the subject merchandise, the plaintiff concurrently seeks to sustain its burden of establishing its claimed alternative classifications. In so doing, it has been clearly established without contradiction that a gravure ink, to which a great portion of testimony has been devoted, contains a colorant; consisting of a pigment or a dye, a binder and a solvent. It likewise appears to be without dispute that a wide variety of inks exist, differing both in constituency as well as in purpose. While writing inks may be characterized by the penetration of the ink into the substrate upon which it is applied, a gravure ink, on the other hand, is produced to provide adhesion with a minimum amount of penetration into the substrate. This drying process is accomplished by evaporation.

In the production of gravure inks, it appears from the uncontroverted evidence that dyes are frequently used as colorants. Various solvents are used therein including water, hydrocarbons, alcohols, esters and ketones. The use of ethylcellulose as a binder in a gravure ink has caused the same to be characterized under the specific designation, Type "B" gravure inks.[3]

In referring to the respective functions of the binder and the solvent contained in a gravure ink, plaintiff's witness, Mr. George, describes the solvent as the dilutant for the ink which liquifies the binder. Upon completion of the printing, the solvent evaporates in the drying process, whereas the binder returns to its original state, binding and affixing the colorant to the substrate.

■ In the Tariff Classification Study, Schedule 4 at 151, the Explanatory Notes state:

Inks, also included in subpart C, are related to paints in that they contain a coloring agent and a *liquid vehicle.* [Emphasis added.]

It, accordingly, must be concluded that a "finished" ink classifiable under item 474.-26, TSUS, necessarily must contain a liquid component. As may be visually observed from the subject merchandise represented by Plaintiff's Exhibits 4–13 inclusive, the dry powder as imported cannot be classified a "finished" ink under the tariff schedules.

■ Nor can it be successfully maintained that the subject merchandise may be classified an "unfinished" ink. The provisions of General Interpretative Rule 10(h) relating to an article, whether "finished or unfinished" cannot be deemed applicable, where, as also provided therein, "the context requires otherwise."[4] From a consideration of the evidence presented, the court, however, is satisfied and, therefore, finds that the imported merchandise in question is, in fact, an ink powder which Congress has specifically described and classified under item 405.10, TSUS, and, accordingly, the "context" requires that the same cannot

2. R. 191–92.

3. V. Strauss, *The Printing Industry* 613.

4. General Interpretative Rule 10(h)—

(h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished; * * *.

be classified as "unfinished" ink under item 474.26, TSUS.[5]

Plaintiff's witness, Mr. George, whose extensive experience in the ink industry lends significant credibility to his testimony, defines an ink powder as possessing all of the components of an ink other than the solvent. His testimony reveals that the ratio of a colorant to a binder in a gravure ink may vary widely, dependent on the desired or required application. Under the supervision of the witness, Mr. George, the imported powders, upon the addition of the solvent, ethanol, were tested by using the same in a gravure printing press. The printing produced thereby was comparable to the quality and standard recognized in the gravure printing industry.

■ In the consideration of the foregoing testimony and its determinative effect, it is important to bear in mind that in determining whether an imported article is embraced within an *eo nomine* designation, its use may be considered in order to determine its identity. *United States v. Quon Quon Company*, 46 CCPA 70, C.A.D. 699 (1959); *Trans-Atlantic Company v. United States*, 68 Cust.Ct. 105, C.D. 4344 (1972). From the evidence presented the court is satisfied that the constituency of the imported merchandise, the addition of the solvent thereto and its subsequent application in its liquid form in a gravure printing process requires the inclusion of the said imported merchandise under its *eo nomine* designation, an ink powder under item 405.10, TSUS.

■ In support of the liquidated classification of the merchandise in question, the defendant contends that an ink powder, within the meaning of the tariff schedules must be water soluble and used in the preparation of writing and drawing inks. In so doing, it relies upon statements made in the *Dictionary of Tariff Information* (1924), and the 1948 *Summaries of Tariff Informa-*

tion, both having been prepared by the United States Tariff Commission. The commodity summaries in these compilations were prepared, however, after the Tariff Acts of 1922 and 1930 respectively, and cannot be said to reflect the congressional intent with respect to the enactment of those acts and/or the provisions contained therein. *See Dodge & Olcott, Inc. v. United States*, 45 CCPA 113, C.A.D. 638 (1958). Nor has this court been able to discover from legislative history or otherwise what specific meaning may have been intended by the Congress to be applied to the term "ink powder" as contained in the tariff schedules. It is axiomatic that an *eo nomine* provision, without limitations or a shown contrary legislative intent, judicial decision, or administrative practice to the contrary, and without proof of commercial designation, will include all forms of said article. *T. M. Duche & Sons, Inc. v. United States*, 44 CCPA 60, C.A.D. 638 (1957). Suffice it to say, that no descriptive limitations are contained with respect thereto in the said tariff schedules.

■ It is, however, a well-established principle of customs law that tariff acts are made not only for the present but also for the future, thereby embracing articles produced by technologies which may not have been employed or known to commence at the time of the enactment of the original provision. *Davies Turner & Co. v. United States*, 45 CCPA 39, C.A.D. 669 (1957). Contrary to the defendant's assertion to this court, it is worthy of note that the 1968 *Summaries of Tariff and Trade Information*, Schedule 4, Volume 10 at 143 indicates that current technology does not restrict the meaning of "ink powders" to water soluble powders, used for the preparation of writing or drawing inks.

Ink powders are materials that become inks upon the addition of *a liquid, usually water*. Ink powders are used mostly in

---

**5.** Were, for the sake of argument, the merchandise in question to be described as an unfinished ink under item 474.26, TSUS, the court, nevertheless would be compelled to classify the same as an ink powder by virtue of General Interpretative Rule 10(c) providing:

(c) an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it; * * *.

the preparation of writing or drawing inks. [Emphasis added.]

It may likewise be noted that the defendant in its answers to plaintiff's interrogatories has admitted that today ink powders are diluted by solvents other than water, such as alcohols and varnishes.

At the conclusion of plaintiff's case, the defendant moved to amend its answer to conform to the evidence by alleging that the subject merchandise should alternatively be classified as a mixture under item 409.00, TSUS, Schedule 4, Part 1, providing:

409.00 Mixtures in whole or in part of any of the products provided for in this subpart . . . . . 3.5¢ per lb. + 22.5% ad val.

Plaintiff has objected to defendant's motion as untimely and prejudicial. The court agrees and the defendant's motion is accordingly denied.

 The dual burden of proof imposed upon a plaintiff in the trial of an action of this character is onerous. In asserting an alternative classification, the defendant should be required to present the same in sufficient time so as to permit the plaintiff an opportunity to properly challenge the correctness thereof. To grant the proffered amendment to defendant's answer after the plaintiff has rested, with the probability that its witness, upon whom the plaintiff must rely to maintain its burden, are no longer available, is to place the plaintiff in a position which is not only prejudicial but patently untenable.[6]

Accordingly, the court finds that the plaintiff has overcome the presumption of correctness attached to the classification of the subject merchandise determined by the Customs Service and from the evidence sub-

mitted has established that the said merchandise at the time of importation is a gravure ink powder, "obtained, derived, or manufactured" in part from a benzenoid chemical provided for in subpart A or B of Part 1, Schedule 4 and properly classified under item 405.10, TSUS.

Let judgment be entered accordingly.

---

**6.** Suffice it to say, that notwithstanding the denial of defendant's motion, the proffered alternative classification could not be sustained with respect to the subject merchandise. In headnote 3(a) to schedule 4 "mixtures" are defined as "substances consisting of two or more ingredients * * * which, however thoroughly commingled, retain their individual chemical properties and are not chemically united."

The very testimony of plaintiff's expert witness, Professor Gryte, upon which the defend-

ant predicates the motion to amend its answer, serves to establish, without contradiction, that the subject powders are not a "mixture" within the defined limitations of the afore-quoted headnote. As previously noted, Professor Gryte in his testimony concludes that the dye colorant in the subject powders has not retained its individual chemical properties and that, in fact, the powders are a "homogeneous mixture," evidencing the dominating effect of the binding agent ethylcellulose.