IT IS HEREBY ORDERED: that the action is dismissed.

**TOMOEGAWA USA, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 82–6–00853.**

United States Court of
International Trade.

Feb. 10, 1988.

Mandel and Grunfeld, Steven P. Florsheim, New York City, for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch (Barbara M. Epstein and Nancy E. Reich, New York City, at trial, Michael T. Ambrosino, on the brief), for defendant.

RE, Chief Judge:

The question presented in this case pertains to the proper classification, for customs duty purposes, of certain merchandise imported from Japan and described on the

commercial invoices as "toner," "dry imaging ink," or "developer."

In 1980 the merchandise was classified by the Customs Service under the basket provision for chemical mixtures, not specially provided for, under item 432.20 of the Tariff Schedules of the United States (TSUS) and also in 1981 under item 432.25. Consequently, the Customs Service assessed duty on the component of the mixture bearing the highest rate, which it deemed at the time to be polyethylene resins dutiable under item 445.30, TSUS, at a rate of 1.3 per centum per pound plus 10 per centum *ad valorem* in 1980, and 13 per centum *ad valorem* in 1981.

Plaintiff protests this classification, and contends that all of the imported substances are inks, namely, electrostatic inks, and are properly classifiable as "[o]ther inks" under item 474.26, TSUS, at the rate of 2 per centum *ad valorem* for all of the dates of entry. In the alternative, plaintiff asserts that the merchandise described in the commercial invoices as "developer" is properly classifiable under the same provisions assigned by Customs, i.e., item 432.20 in 1980, or item 432.25 in 1981, but at the lower duty rates of 4.8 per centum *ad valorem* in 1980 or 4.7 per centum *ad valorem* in 1981.

After receiving a classified list of the components of the imported merchandise, the Customs Service learned that the merchandise did not contain polyethylene resins. As a consequence, the government advanced several alternative classifications. It is the government's primary contention that the toner and developer are properly classifiable as "[p]hotographic chemicals," under items 405.20, TSUS, in 1980 and 408.41, TSUS, in 1981.

The pertinent statutory provisions of the tariff schedules are as follows:

Classified under:

Schedule 4, Part 2:

Subpart E.—Chemical Mixtures

Mixtures not specially provided for:

. . . .

Other:

. . . .

432.20 (1980) Other ................4.8% ad val.
432.25 (1981) (4.7% ad val. (1981)), but not less than the highest applicable to any component material.

. . . .

Synthetic plastics materials:

. . . .

445.30 Polyethylene resins ....1.3¢ per lb. plus 10% ad val. (1980) 13.6% ad val. (1981)

Claimed under:

Schedule 4, Part 9:

Inks and ink powders:

. . . .

474.26 Other inks ............2% ad val.

Alternative claim of the government:

Schedule 4, Part 1:

Subpart C.—Finished Organic Chemical Products

. . . .

Products obtained, derived, or manufactured in whole or in part from any product provided for in subpart A or B of this part:

. . . .

405.20 (1980) Photographic chemicals ...0.3¢ per lb. plus 19% ad val.

408.41 (1981) Photographic chemicals ...18.1% ad val.

Additional alternative claim of the government:

Colors, dyes, stains, and related products:

. . . .

Colors, dyes and stains (except toners), whether soluble or not in water, obtained, derived or manufactured in whole or in part from any product provided for in subpart A or B of this part:

. . . .

406.50 (1980) Other ................20% ad val.

410.22 (1981) Other ................18% ad val.

The question presented is whether, within the meaning of the tariff provisions, the imported merchandise is dutiable as "[o]ther inks," under item 474.26, as claimed by plaintiff, or as "[p]hotographic chemicals" under items 405.20 in 1980, and 408.41 in 1981, as contended by the government. In this case, there is no presumption of correctness that attaches to the government's classification, and the court must consider both the importer's and the government's claimed classifications.

When the classification of the Customs Service is admittedly erroneous or made in error, there is no presumption of correctness and the importer does not have the burden of overcoming the statutory presumption. *See United States v. Magnus, Mabee & Reynard, Inc.*, 39 CCPA 1, 7, C.A.D. 455 (1951); *see also* 28 U.S.C. § 2639 (1982). Moreover, the presumption of correctness does not extend to the new claims of the government. *See J.M. Rodgers Co., Inc. v. United States*, 59 Cust.Ct. 91, 95, 273 F.Supp. 442, 445 (1967). Nevertheless, the importer must offer sufficient evidence to prove its claim. *United States v. Magnus, Mabee & Reynard, Inc.*, 39 CCPA at 7. If the plaintiff establishes a prima facie case, the government has the burden of going forward with evidence to rebut or negate plaintiff's case. *See Sanyo Elec. Inc. v. United States*, 84 Cust.Ct. 167, 179, 496 F.Supp. 1311, 1320 (1980) (citing *E.R. Squibb & Sons, Inc. v. United States*, 75 Cust.Ct. 193, 196, C.R.D. 75-7 (1975)), *aff'd*, 68 CCPA 14, 642 F.2d 435 (1981).

The imported merchandise consists of three types of dry powder substances, monocomponent toner, toner for two-component systems, and developer. Both toner and developer are essential elements of the electrophotographic process. This process is of significant practical value, and is utilized in office photocopy machines, in the printing industry, and in office printing devices, such as laser printers and facsimile machines. The powders at issue in this case were developed for use in various office copy machines.

The monocomponent toners consist of magnetic iron (magnetite) particles incapsulated in toner, which consists of resinous materials, carbon black, and, at times, a dye. The two-component systems consist of both toner and developer. The toner is manufactured by mixing all of its ingredients, heating and cooling it, and then grinding it to achieve a desired particle size. Developer is a mixture of approximately 90% iron powder and 10% toner. When necessary, dyes are used in small quantities to effect the tint or color of the reproduction.

Toner is defined as "[t]he fine, black, resinous powder used in electrostatic imaging processes to make an electrostatic image readable; the toner is either deposited directly on coated paper or transferred from a charged surface to ordinary paper, then fused to the paper by heating." *McGraw–Hill Dictionary of Scientific and Technical Terms* 1656 (3d ed. 1984).

Plaintiff described the function of toner and the electrophotographic process as follows:

> Xerography, or plain paper copying with toner, is basically a five-step process: (1) a photoconductive drum or belt is given a uniform positive electrical charge; (2) the drum's charged surface is exposed just like a photographic plate, by reflecting an image of the original document to be copied through a lens; (3) developer beads carry negatively-charged toner particles to the positively-charged image areas on the drum, forming a powder image of the original; (4) a positively-charged sheet of paper comes in contact with the powder image on the drum and electrically attracts the toner particles, thereby transferring the image to the paper; (5) the surface of the paper is heated under pressure, melting the toner powder image and fusing it to the paper.

Plaintiff maintains that toner is equivalent to ink because it is often referred to as ink, or dry ink, and also because toner is composed of the same basic ingredients as ink, a resinous vehicle and a colorant, such as carbon black. Plaintiff notes that toner has the same basic purpose as ink, that is, "to impart a printed image upon paper (or other suitable substrate)." Plaintiff concedes that developer is not commonly referred to as ink, but contends that toner, which plaintiff classifies as ink, is the only active ingredient in developer. Nevertheless, plaintiff acknowledges that the court may deem the developer not simply to be ink, but, rather, a mixture of ink and iron powder. Hence, it submits an alternative classification for developer under the basket provision for chemical mixtures not

specially provided for, under item 432.20 in 1980, and item 432.25 in 1981.

The defendant contends that plaintiff's proffered classifications are fatally flawed because toners and developers do not contain a liquid, and therefore are not ink within the meaning of the appropriate tariff provisions. The defendant maintains that the toners and developers function as part of a photographic process, and therefore are photographic chemicals.

■ In order to determine whether the imported merchandise is ink, the court must ascertain the meaning of ink as used by Congress in the tariff schedules. It is a well-established principle of customs law that in the absence of evidence to the contrary, " '[t]he meaning of a tariff term is presumed to be the same as its common or dictionary meaning....' " *See Rohm & Haas Co. v. United States*, 727 F.2d 1095, 1097 (Fed.Cir.1984) (quoting *Bentkamp v. United States*, 40 CCPA 70, 78 (1952)). Another basic principle is that the "common meaning of a tariff term is not a question of fact, but a question of law to be decided by the court." *See Schott Optical Glass, Inc. v. United States*, 82 Cust.Ct. 11, 16, 468 F.Supp. 1318, 1321, *aff'd*, 67 CCPA 32, 612 F.2d 1283 (1979). Consequently, to determine whether the imported material is "ink" within the tariff schedules, the court must consider not only the testimony offered at trial, but also the pertinent judicial authority as well as lexicographic and scientific definitions.

It is the plaintiff's primary contention that the merchandise consists of inks, and is properly classifiable as "[o]ther inks," under item 474.26, TSUS. While acknowledging that most "traditional" inks are in liquid form, plaintiff notes that the ink provision is an *eo nomine* designation, which, absent demonstrated legislative intent to the contrary, includes all forms of the article. *See NEC America, Inc. v. United States*, 8 CIT 184, 186, 596 F.Supp. 466, 468 (1984), *aff'd*, 760 F.2d 1295 (Fed. Cir.1985).

To support its contention that the toner and the developer should be classified as inks, the plaintiff introduced evidence that the type of merchandise in question is commonly referred to in the trade as "dry ink." It also noted that the substances are referred to as inks in certain publications of the United States International Trade Commission.

The plaintiff asserts that ink can take a form other than liquid, and cites certain lexicographic sources. Plaintiff notes that the *Funk & Wagnells New Standard Dictionary of the English Language* 1265 (1942) defines the term ink as "[a] colored liquid or viscous substance used in writing, drawing or printing; also, a solid mixture, as of pigments, used by lithographers in forming a rubbed tint...." In addition, plaintiff cites the *McGraw–Hill Encyclopedia of Science & Technology* 159 (5th ed. 1982), which defines ink as "[a] dispersion of a pigment or a solution of a dye in a carrier vehicle, yielding a fluid, paste or powder to be applied to and 'dried' on a substrate." At trial, plaintiff called two witnesses. The first witness, Mr. Shapoor Azari, who holds a Bachelor of Science degree in chemistry, and is the Vice President of Operations for the plaintiff, Tomoegawa, USA, Inc., testified that, in his opinion, the merchandise in issue is ink, adding that "there are many similarities [in] both printing ink and toner...." He noted that they have the same type of ingredients as well as a common source for raw materials, and that they are used for the same purpose, i.e., "to impart a developed image to a substrate."

Plaintiff's second witness, Dr. Thomas J. Kucera, a self-employed chemical and reprographic consultant who holds a Ph.D. in organic chemistry and chemical engineering, agreed with Mr. Azari that the merchandise is ink. He testified that toners and developers have been referred to "almost continuously ... by technical people, laboratory people, trade people, and people in general" as dry inks.

Plaintiff also relies on the fact, conceded by the defendant, that the toner and developer contain the same basic elements as ink. Although the existence of these ingredients is relevant, plaintiff is unable to distinguish the clear and categorical defini-

tion of ink established by this court in *Corporacion Sublistatica, S.A. v. United States,* 1 CIT 120, 124, 511 F.Supp. 805, 808 (1981). In *Corporacion Sublistatica,* this court stated that "a 'finished' ink classifiable under 474.26, TSUS, *necessarily* must contain a liquid component." 1 CIT at 124, 511 F.Supp. at 808 (emphasis added). The court's determination in *Corporacion Sublistatica,* that ink requires a liquid component, is precedential because it is integral to the court's holding and is not mere dicta. *See, e.g., Donovan v. Red Star Marine Services, Inc.,* 739 F.2d 774, 782 (2d Cir. 1984).

The court, in *Corporacion Sublistatica,* in noting the legislative history of the term "ink," cited the 1960 *Tariff Classification Study,* prepared by the United States Tariff Commission. *See* 1 CIT at 125, 511 F.Supp. at 808. It is well established in customs law that in order to resolve questions relating to the meaning and scope of terms which appear in the tariff schedules, and to ascertain legislative intent, reference may be made to the 1960 *Tariff Classification Study. See Rifkin Textiles Corp. v. United States,* 54 CCPA 138, 140–41, C.A.D. 925, *cert. denied,* 389 U.S. 931, 88 S.Ct. 294, 19 L.Ed.2d 283 (1967). The *Tariff Classification Study,* Schedule 4, Part 9, at 151, states that "[i]nks ... are related to paints in that they contain a coloring agent and a liquid vehicle." Hence, the court must agree with the view expressed in *Corporacion Sublistatica,* that it was the intention of Congress that ink, under the tariff schedules, must contain a liquid component. *See* 1 CIT at 124, 511 F.Supp. at 808.

Plaintiff attempts to distinguish *Corporacion Sublistatica* by suggesting that, in determining the proper classification of a gravure ink in powder (solid) form, the court was limiting its decision to "unfinished" inks. The distinction, however, is unpersuasive in light of the court's unequivocal statement that merchandise lacking a liquid component was not a "finished ink." *See id.*

In support of its primary contention that the imported merchandise in issue should have been classified as ink, under item 474.26, TSUS, plaintiff invokes the principle that tariff statutes are written in the language of commerce, which is presumed to be the same as its common meaning. *See Nylos Trading Co. v. United States,* 37 CCPA 71, 73, C.A.D. 422 (1949). This principle, however, is not dispositive because the focus is not simply whether toners have been referred to as "inks," but whether the industry refers to them as "inks" because they are viewed substantively as inks. In this instance, as the defendant has shown, the word "ink" when used in commerce to refer to toners, is used essentially for marketing purposes, to enable laymen to understand the general concept behind the use of toner.

Defendant's witness, Mr. John Walkonis, Assistant Director of Research for Olin Hunt Special Products, Inc., and a chemist with 24 years of experience, testified that he had never heard the dry toners and developers referred to technically as inks. Mr. Walkonis, who was involved in the development and marketing of toners by his company, added that, although his company has marketed some of its toners as inks, he attributed the designation to marketing strategy rather than technical accuracy.

Although plaintiff points to a variety of uses for the term ink, from sales catalogs to publications of the United States International Trade Commission, it produced no evidence to suggest that the terminology was used in an accurate or technical sense rather than as a marketing device. Furthermore, although catalog references may be helpful and may offer guidance, they are not dispositive. *See United States v. Sheep Shearers Mdse. & Comm. Co.,* 23 CCPA 146, 150, T.D. 48009 (1935).

The defendant emphasizes the authority of the *Corporacion Sublistatica* case to support its contention that toners and developers are not inks within the meaning of the tariff schedules because they do not contain a liquid component. The defendant, however, also brought the following factors to the attention of the court: that labels and promotional materials referring

to toner as "dry inks" were for marketing, not technical purposes; that the references made in recent publications of the United States International Trade Commission, because of different factual situations, were not pertinent; and that lexicographic materials cited by plaintiff did not encompass powdered ink which did not in any way contain a liquid component. In addition, the defendant stressed that xerography has been described as an "inkless" process. *See* Reifer, *Dictionary of New Words* 231 (1955).

After a thorough consideration of the question, the court has concluded that references to toner in commercial parlance as dry ink are for marketing purposes to assist lay persons to understand the use of the merchandise. The court has also concluded that the legislature intended "ink," for tariff purposes, to include a liquid vehicle, and therefore, it becomes unnecessary to pursue plaintiff's further contentions as to the classification of toner as ink.

■ The plaintiff offers an alternative classification for the imported developers, which consist of a mixture of ink and iron powder. Because developer is a mixture of iron powder (90%) and toner (10%), plaintiff contends that it is described by the chemical mixture provisions, items 432.20 (1980) and 432.25 (1981), TSUS, with duty rates, respectively, of 4.8 per centum and 4.7 per centum.

Plaintiff's alternative classification, however, is unavailing in light of invasionary headnote 1 of Part 2 of Schedule 4, under which fall items 432.20 and 432.25. The headnote provides that "[t]his part covers chemicals, except those provided for elsewhere in this schedule and those specially provided for in any of the other schedules." The court agrees with the contention of the defendant that the toners and developers are properly classifiable as "[p]hotographic chemicals" under items 405.20 and 408.41, TSUS. In sum, the "[p]hotographic chemicals" classification amounts to an overriding provision within schedule 4 as contemplated by invasionary headnote 1.

■ The defendant contends that the imported merchandise is properly classifiable as "[p]hotographic chemicals." "Photographic chemicals," under TSUS items 405.-20 (1980) and 408.41 (1981), is an *eo nomine* designation. It is basic in customs law that an *eo nomine* designation, in the absence of a demonstrated legislative intent to the contrary, includes all forms of the article. *See NEC America Inc. v. United States*, 8 CIT 184, 186, 596 F.Supp. 466, 468 (1984), *aff'd*, 760 F.2d 1295 (Fed. Cir.1985). Hence, for the government's proposed classification to be correct, it must be demonstrated that the term "[p]hotographic chemicals" includes toners and developers used in the electrophotographic process. Although the legislative history does not offer specific guidance on this question, it is certain that the tariff schedules were enacted "not only for the present but also for the future, thereby embracing articles produced by technologies which may not have been employed or known to commerce at the time of the enactment of the original provision." *Corporacion Sublistatica, S.A. v. United States*, 1 CIT 120, 126, 511 F.Supp. 805, 809 (1981).

The court must initially determine whether the process of electrophotography is encompassed by the term photography. In order to determine the common meaning of photography, the court may consult dictionaries, scientific authorities, case law, and other reliable sources. *See Schott Optical Glass, Inc. v. United States*, 82 Cust.Ct. 11, 16, 468 F.Supp. 1318, 1321, *aff'd*, 67 CCPA 32, 612 F.2d 1283 (1979). In the *McGraw–Hill Dictionary of Scientific and Technical terms* 1206 (3d ed. 1984), photography is defined in sweeping language as "[t]he process of forming visible images directly or indirectly by the action of light or other forms of radiation on sensitive surfaces." *Van Nostrand's Scientific Encyclopedia* 1766 (5th ed. 1976) defines photography as "[a] technology in which processes and techniques are used to produce images through the action of electromagnetic radiation. The term embraces all processes employing materials sensitive to visible light, or to other forms of radiant energy...." *Webster's Third New International Dictionary* 1702 (1981) defines

photography as "an art or process of producing a negative or positive image directly or indirectly on a sensitized surface by the action of light or other forms of radiant energy."

Defendant contends that lexicographic sources and the testimony at trial establish that the electrophotographic process is a form of photography. *Van Nostrand's Scientific Encyclopedia* 1770 (5th ed. 1976) explains electrostatic photography (also called xerography and electrophotography) as follows:

As in wet (silver halide) photography, the dry electrophotographic process forms a latent image by exposing a sensitive layer to light. This image is then made visible by a dry-process technique, in contrast to the usual (wet) processes of conventional photography. In general, for electrostatic photography, the sensitive layer is usually a photoconductor which is charged. On exposure, the latent image is formed as a pattern of charge, which is made visible during development by having finely divided powders attracted electrostatically to the charged areas of the latent image.... Such small particles, usually charged, are referred to as *toners*.

*Webster's Third New International Dictionary* 733 (1981) defines electrophotography as "photography in which images are produced by electrical means (as in xerography)." The same source provides the following definition of xerography:

the formation of pictures or copies of graphic matter by the action of light on an electrically charged photoconductive insulating surface in which the latent image usu[ally] is developed with powders that adhere only the areas that remain electrically charged and in which the image formed by the powders sometimes is transferred to a sheet of paper.

*Webster's Third New International Dictionary* 2644 (1981).

At trial, defendant's expert witness, Mr. John Walkonis, testified that he agreed with the excerpt read to him from the *Encyclopedia of the Electrochemical Industry*. According to the excerpt read to the witness from page 1177, "xerography is a relatively new photographic process based on the physical phenomena of photoconductivity and electrostatics rather than on a photochemical reaction as other photographic processes." Mr. Walkonis testified that the processes of photography and electrophotography are similar in many ways, in that, both processes utilize light to form an image on a surface, and in both cases the latent image must be developed and fixed on another surface.

The expert testimony of Mr. Walkonis, supports the lexicographic authorities which state that the electrophotographic process utilizes a photographic procedure. As defendant notes, the definitions of photography "clearly embrace all processes involving the formation of images by the action of radiant energy on sensitive surfaces."

Although expert testimony as to the common meaning of a tariff term is merely advisory, it is nevertheless probative when, as in this case, it is supported by lexicographic and other technical sources. *See NEC America, Inc. v. United States*, 8 CIT 184, 190, 596 F.Supp. 466, 471 (1984), *aff'd*, 760 F.2d 1295 (Fed.Cir.1985). Although all of the expert testimony was helpful, the court found the testimony of Mr. Walkonis, the defendant's expert, both instructive and persuasive. *See A & A International Inc. v. United States*, 11 CIT ——, 676 F.Supp. 263–269 (1987). Drawing on his academic training, as well as his 24 years as a chemist, Mr. Walkonis testified that "electrophotography is a photographic process in many ways," the most basic of which is "the formation of a latent image on a substrate." This testimony is well supported by lexicographic sources.

Plaintiff contends that, although the electrophotographic process utilizes a photographic procedure, the process is essentially electrical, and, "[u]nlike photography, there are no chemical reactions involved ... and the process is not based on silver." Hence, plaintiff argues that the lack of chemical reaction in the process negates the "photographic chemicals" designation. It is acknowledged that the traditional pho-

tographic process involves the use of chemicals to expose changes in silver halide made by light. *See McGraw–Hill Encyclopedia of Science and Technology* 200 (5th ed. 1982). As previously described, the process of electophotography utilizes electrostatics or electricity in forming latent images on a substrate, rather than a chemical solution. The image is then developed by using toner.

The fact that electrophotography involves the use of electrostatic properties rather than chemical reactions does not preclude it from being a photographic process. Furthermore, the tariff schedules do not require that materials create a chemical reaction to be classified as "[p]hotographic chemicals." Toner and developer are clearly chemicals, and plaintiff has conceded this point by arguing that developer, which contains toner as an active ingredient, is alternatively classifiable under item 432.20 or 432.25, TSUS, as chemical mixtures not specially provided for. It is clear therefore, that toner and developer are chemicals utilized in a photographic process. Since toner and developer are chemicals used in a photographic process, the court has concluded that the defendant's proposed classification of the merchandise as "[p]hotographic chemicals" under items 405.20 (1980) and 408.41 (1981), TSUS, is correct.

Defendant contends that the toner and developer are alternatively classifiable as colors, dyes and stains, under TSUS item 406.50 (1980) and 410.22 (1981), with the exception of those designated CHT–1, CP–7 and APECO M620, because the products contain a solvent dye. According to defendant's second witness, Mr. Thomas Governo, a United States Customs Service chemist for 15 years, plaintiff's confidential list of chemicals revealed that the merchandise contained black solvent dyes. Mr. Governo also testified that the toners and developers that he analyzed previously for the Customs Service, are essentially the same as the merchandise at issue in this case.

Mr. Governo defined a dye or stain as "a material that is used to impart color to another substance." Although arguably, the toner and developer do accomplish this function, the items are more that just dyes or colors, and, therefore, can not properly be classified under that heading. As previously described, an important function of the imported merchandise is to develop the latent image which is formed on the charged substrate, by the attraction of the toner and developer particles to the substrate. It is clear that the imported merchandise is of a particular kind and is prepared for the particular process of electrophotography. Hence, "[p]hotographic chemicals" is a designation which more specifically describes the merchandise than "[c]olors, dyes and stains ... [o]ther." *See John J. Coates Co. v. United States*, 44 CCPA 97, 102 (1957). When an article is described by more than one item, it is to be classified under the provision which describes it most specifically. *See* General Interpretative Rule 10(c), TSUS; *see, e.g., Aceto Chemical Co. v. United States*, 59 CCPA 212, 220–21, 465 F.2d 908, 914 (Fed. Cir.1972). Consequently, the court cannot agree with the defendant's other alternative classifications.

After a careful consideration of the testimony of the witnesses, lexicographic definitions, relevant case law, and all other pertinent sources, the court holds that the imported toners and developers are properly classifiable as "[p]hotographic chemicals" under item 405.20, TSUS, for the merchandise imported in 1980, and item 408.41, TSUS, for the merchandise imported in 1981. It is therefore ordered that the entries be reliquidated, and that the plaintiff pay the defendant the amount of duty required under items 405.20 and 408.41, TSUS.